Hillsborough
No. 6778

MANCHESTER HOUSING AUTHORITY

v.

ARMS TEXTILE MFG. CO. & a.

May 31, 1974

*Craig, Wenners & Craig* and *Joseph F. McDowell III (Mr. McDowell* orally) for the plaintiff.

*McLane, Graf, Greene & Brown* and *Arthur G. Greene (Mr. Greene* orally) for the defendants.

GRIMES, J. In a land condemnation proceeding defendant-company appeals from the denial of its motion that jury trial be waived because of adverse publicity allegedly, created by the plaintiff-Manchester Housing Authority. After a full hearing held on November 20, 1972, and a denial of the motion announced December 19, 1972, defendant, on February 23, 1973, filed a proposed reserved case which was transferred to this court by *Cann*, J.

Plaintiff raises a threshold issue of the denial of its motion to dismiss defendant's proposed reserved case. Plaintiff argues that no exception was taken to the December denial of defendant's motion to waive jury trial and that the reserved case filed on February 23, 1973, was not timely filed under Superior Court Rule 69. Although it is by no means clear that rule 69 applies to preliminary motions, "[t]he Trial Court has undoubted authority to suspend Rule [69] if justice required. *Sanborn v. Railroad*, 76 N.H. 65; *Hall v. Insurance Co.*, 91 N.H. 6, 8." *Timmins v. Brennan*, 103 N.H. 459, 460, 174 A.2d 419, 420 (1961).

As part of its "Amoskeag Millyard Project", on January 19, 1970, the Manchester Housing Authority filed a petition for condemnation of land and buildings which included defendant's mill. Defendant's property had been used to manufacture goat hair textiles. The goat hair came from all over the world. Some of it contained anthrax spores and over a long period of time the mill itself became contaminated. Consequently, the threat of disease and especially the cost of decontaminating the mill became a controversial public issue. Prior to the publicity complained of, the parties had made an agreement whereby all expenses incurred in decontamination were to be admissible in evidence in determining compensation for the property even though the decontamination took place after the property changed hands. The cost of decontamination went considerably beyond the $20,000 to $25,000 amount originally estimated by defendant and ultimately cost approximately $250,000.

No findings or rulings were made by the trial court but the record of the hearing indicates the following facts.

The publicity on which defendant bottoms its motion to have jury trial waived was spread out over a period of at least twelve months. On November 12, 1970, an article titled "Deadly Anthrax a Problem for Queen City Authority" appeared on the first page of both city and state editions of the *Manchester Union Leader*. At this point, counsel for defendant sent a letter to counsel for the authority objecting to the publicity. In November and December of 1970, two other articles on the problem appeared, one in the *Union Leader* and one in the *New Hampshire Sunday News* which carried the headline "Battle Deadly Anthrax". In the same months, the *Concord Monitor* also carried an article and two Manchester radio stations each broadcast programs on the story which were allegedly very prejudicial. The issue then lay dormant for three months until revived on April 8, 1971, by a *Union Leader* article titled "State and U.S. Will Help to Solve Anthrax Woes." Subsequently eight articles of varying prominence in either the *Union Leader* or the *New Hampshire Sunday News* carried the story. These articles were spread out fairly evenly from the first of July through the end of November 1971. Many of the articles attributed their information to officials of the plaintiff.

Because much of the publicity allegedly dealt with the cost of decontamination, because it was purveyed throughout the State over a prolonged period of time, and because the authority was allegedly responsible for it, defendant argues that it could not get a fair trial in any county and that the housing authority thereby waived its right to jury trial by conduct inconsistent with that right.

The right to jury trial in condemnation suits is conferred by statute, RSA 4:35, and can be invoked by the condemnor as well as the property owner. *Whelton v. State,* 106 N.H. 362, 211 A.2d 409 (1965). Language in several cases has indicated that the right can be waived by conduct inconsistent with the right. *King v. Hutchins,* 26 N.H. 139 (1852); *Stevens v. Insurance Co.,* 84 N.H. 275, 149 A. 498 (1930); *Nassif Realty Corp. v. National Fire Ins. Co.,* 107 N.H. 267, 220 A.2d 748 (1966). But the conduct referred to in these

situations arose in the context of trial strategy or entailed compliance with court rules or the filing of certain motions. The conduct was usually that of the attorney in presenting the case to the court, was somehow related to or showed contemplation of the issue of waiver of the right, and amounted to an estoppel against the party requesting jury trial. *Stevens v. Insurance Co., supra* at 283, 149 A. at 504. The argument here is that out-of-court conduct of the party had the effect of denying the possibility of a fair trial by jury. Consequently, those cases cited by defendant which deal with waiver by conduct are not apposite.

In *State v. Nelson,* 103 N.H. 478, 484, 175 A.2d 814, 818-19 (1961), this court held that in balancing constitutional freedom of the press against the defendants' right to a fair trial, the trial court was not required to take the extreme measure of dismissing indictments, but could use less drastic measures to guard against prejudice from publicity. Although dismissal of the petition is not involved here, the reasoning of *Nelson* applies in that the trial court must initially assess the possibility of prejudice and decide in its discretion what protective measures are required.

We think the court below properly exercised its discretion in denying defendant's motion. The publicity complained of was a year old at the time of the hearing on defendant's motion. It is now two-and-a-half-years old and by the time of trial will be still older. Before the empanelling of a jury, it is impossible to judge if the publicity would still be prejudicial. Assuming the possibility of prejudice, the trial court has available a number of prophylactic measures short of denying plaintiff its right to a jury trial. *See* ABA Standards Relating to Fair Trial and Free Press (1967). The jury can be drawn from residents outside the immediate Manchester area where interest in the controversy would have been less acute. The voir dire by the court can be extensive. Finally, the court can entertain a motion for change of venue. Considering the lapse of time since the publicity, the fact that no jury has yet been empanelled, and the numerous other ways for controlling the prejudicial effect of publicity, the trial court was within its dis-

cretion in denying defendant's motion. We do not say the trial court is always without authority to deny a trial by jury. More extreme circumstances than those present here could justify a finding that prejudicial publicity made it impossible to conduct a fair jury trial.

Defendant requests in the alternative to be relieved of its stipulation that cost of decontamination be introduced in evidence. The argument for this request is that defendant should not be bound to an agreement which was entered into previous to and subsequently undermined by adverse publicity. This issue has never been presented to the trial court. Accordingly, it presents no question of law to this court. *United States F. & G. Co. v. Kancer,* 108 N.H. 450, 453, 238 A.2d 5, 8 (1968).

*Defendant's exceptions overruled; remanded.*

All concurred.